## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

KRISTOPHER CANTRELL                     :
                                        :
                                        :
      v.                                   :        Civil No. CCB-07-2778
                                        :
                                        :
WIRTGEN AMERICA, INC., et al.           :
                                        :
                                        :

## MEMORANDUM

Kristopher Cantrell has sued Wirtgen America, Inc., and Wirtgen GmbH ("the defendants") under the theories of strict liability, negligence, and breach of warranty for allegedly manufacturing a defectively designed road milling machine. Now pending before the court are the defendants' motions to exclude certain opinions by the plaintiff's expert witnesses and the defendants' motion for summary judgment. For the reasons stated below, the defendants' motion to exclude the plaintiff's expert witnesses will be denied and the defendants' motion for summary judgment will be granted in part and denied in part.[1]

## BACKGROUND

Both Wirtgen GmbH and Wirtgen America are members of the Wirtgen Group, an international group of companies engaged in the construction equipment industry. Wirtgen GmbH designs and manufactures machines used for road construction. Wirtgen America sells

---

[1] The defendants also have moved to seal all motions, oppositions, and replies currently before the court. Because portions of the motions and their oppositions reveal Wirtgen's sales figures, design processes, and evaluation of new product features, the motions to seal will be granted, but counsel are instructed to file redacted versions for the public record.

and distributes road construction machines, including those manufactured by Wirtgen GmbH. In 1998 and 1999, Wirtgen GmbH completed design of the W2000 road milling machine. A road milling machine removes the surface of highways, roadways, and parking lots in preparation for resurfacing. The W2000 is 48 feet long and 9 feet wide. It was designed with three points of access—the operator station located on top of the machine and two control panels located on the rear sides of the machine. The W2000 also contains four crawler tracks, two in the front and two in the rear. The crawler tracks are situated within the silhouette of the machine's body to reduce the hazard that someone might be run over by the tracks. All four crawler tracks pivot to allow the W2000 to make turns, but the rear tracks are typically used only to make tighter turns. When the machine is turned to its sharpest angle, the rear tracks that are normally recessed beneath the body of the machine protrude. On the left side, the rear tracks protrude only up to one inch. On the right side, the rear tracks can protrude up to 17 inches beyond the body of the machine. The three points of access were located by design to avoid a safety hazard when the crawler tracks are turned to their limits.

When the W2000's milling drum is engaged, the milled surface is funneled along a 23-foot long conveyor belt mounted to the front of the machine into a dump truck that drives alongside the machine. Because not all of the debris created by the W2000 lands in the dump truck, members of a ground crew must manually remove leftover debris. To make it more convenient for the ground crew, Wirtgen GmbH equipped the W2000 with a shovel holder on the back right corner of the machine, directly above the right rear crawler track.

In 2004, Mark Lang, Inc., a paving and road contractor based in Millersville, Maryland, purchased a W2000 from Wirtgen America. A couple of months following the purchase, Mark

Lang, Inc., hired Mr. Cantrell to work as an unskilled construction laborer for the company. Mr. Cantrell had never before worked as a construction laborer.

On November 16, 2004, Mark Lang, Inc. was employed on a job necessitating the use of the W2000. Mr. Cantrell was working as a member of the ground crew and was tasked with directing the dump truck that received debris from the W2000's conveyor belt. After making a successful cutting pass, the operator of the W2000 put the machine into reverse so that he could return to the starting position to begin a new cut. As the W2000 began traveling in reverse, Mr. Cantrell noticed scattered debris in the path of the machine. Mr. Cantrell walked along the right side of the machine to access the shovel so that he could remove the debris from the path of the W2000. When Mr. Cantrell reached the back corner of the W2000, he turned sideways to grab the shovel with his left arm. Because the W2000 was traveling directly in reverse at that time, Mr. Cantrell's body and feet were safely outside the path of the crawler tracks. Unfortunately, at that moment, the operator made a sharp turn, causing the rear crawler tracks to turn toward Mr. Cantrell. As a result, Mr. Cantrell's left foot became caught under the moving track. His left foot and leg were crushed under several tons of weight, necessitating the amputation of his left leg from the knee down.

On October 12, 2007, Mr. Cantrell commenced this civil action against Wirtgen GmbH and Wirtgen America. On May 3, 2010, the defendants filed a motion to exclude certain opinions by the plaintiff's experts and a motion for summary judgment. On June 6, 2010, the defendants filed a motion to exclude as untimely additional opinions by Mr. Clevenger. Mr. Cantrell has opposed all three of these motions.

<u>**ANALYSIS**</u>

**A.     Daubert Motion**

Pursuant to Federal Rule of Evidence 702, the defendants move to exclude the testimony of James Clevenger and the testimony of Dr. William Vigilante. The defendants argue that the testimony offered by these experts should be excluded because (1) they are not qualified; (2) their opinions are not relevant; and (3) their methodologies are not sufficiently reliable under Rule 702. The defendants specifically challenge the experts' conclusions that Mr. Cantrell's accident was foreseeable, that the placement of the shovel on the back rear side was unreasonably dangerous, and that a safer alternative design was feasible.[2]

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Fed. R. Evid. 702; *see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587-88 (1993). The party seeking to introduce an expert's opinions bears the burden of establishing that the "pertinent admissibility requirements are met by a preponderance of the evidence." Fed. R. Evid. 702 advisory committee notes (citing *Bourjaily v. United States*, 483 U.S. 171 (1987)). A trial judge, acting as gatekeeper, is guided by two overarching but competing principles when deciding whether to admit an expert's conclusions. First, Rule 702 was intended to liberalize the introduction of relevant expert testimony and thus encourages courts to rely on vigorous cross-examination and presentation of contrary evidence to counterbalance expert opinions of

---

[2] The defendants also move to exclude an additional opinion of Mr. Clevenger that placement of the shovel holder on the left side of the machine, instead of the right, would have been a feasible design alternative. (*See* Defs.' Mot. to Exclude, ECF No. 60.) The defendants contend that this opinion is new and untimely because it was filed after the April 8, 2009 scheduling order deadline for Rule 26(e)(2) disclosures. The defendants' motion will be denied. Mr. Clevenger disclosed his intent to testify to this opinion in his official report, which was filed on February 19, 2009, well before the applicable deadline. (*See* Clevenger Report at 5, Feb. 19, 2009.) Thus, it is not an additional or new opinion.

uncertain accuracy. *See Daubert*, 509 U.S. at 596; *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999). Simultaneously, a trial court must mind the high potential for expert opinions to mislead, rather than enlighten, a jury. *Westberry*, 178 F.3d at 261.

### 1. Qualifications of the Experts

Under Rule 702, to be qualified as an expert, a witness must have "knowledge, skill, experience, training, or education" in the subject area in which he intends to testify. Fed. R. Evid. 702. Whether an expert's qualifications are sufficient depends on "the nature of the opinion he offers." *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir. 1984); *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) ("[T]here are many different kinds of experts, and many different kinds of expertise."). Just because a witness may be qualified as an expert in one area, "does not *ipso facto* qualify him to testify as an expert in all related areas." *Shreve v. Sears, Roebuck & Co.*, 166 F. Supp. 2d 378, 391 (D. Md. 2001). But, the fit between an expert's specialized knowledge and experience does not need to be exact. *Id.* at 392 (citing *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991)).

The defendants argue that Mr. Clevenger, a mechanical engineer, is not qualified to testify regarding the W2000 because he has never designed a road milling machine. A mechanical engineer is not necessarily qualified to testify as an expert on any issue within the vast field of mechanical engineering. Rather, he must possess some special skill, knowledge, or experience concerning the particular issue before the court. *Id.* at 392. This does not mean, however, that Mr. Clevenger must have personally designed a road milling machine to be qualified as an expert in this case. *See, e.g.*, *id.* (citing *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 176 (5th Cir. 1990) (allowing a professor of mechanical engineering

to testify about designing point-of-operation safeguards for the press brake industry even though he had never designed a press brake or safeguards because he had practical experience designing similar devices and had conducted a review of the relevant literature)). To establish that he is qualified to testify, Mr. Clevenger need only demonstrate that he possesses some special skill, knowledge, or experience concerning the issue before this court, i.e., whether the W2000 was defectively designed.

Mr. Clevenger holds a bachelors and masters degree in agricultural engineering. He worked for over 35 years as a design and mechanical engineer at New Holland, during which time he held titles as Chief Engineer, Design Manager, and Design Engineer. (*See* Clevenger Aff. ¶ 2, May 24, 2010.) Mr. Clevenger himself has designed and performed risk assessments of "hundreds of mobile machine products including industrial/construction equipment." (*Id.*) A risk assessment includes evaluating the characteristics and performance of a machine in light of the people who operate the machine and the surrounding environment in which the machine operates. (*Id.* at ¶ 8.) In other words, it was part of Mr. Clevenger's job to evaluate the limits of mobile machinery by measuring its intended and reasonably foreseeable uses. For purposes of this litigation in particular, Mr. Clevenger also reviewed the deposition testimony of Wirtgen GmbH's safety director and design engineers and inspected the technical specifications for the W2000 product line. Finally, Mr. Clevenger conducted an inspection of an actual W2000, though not the same machine as the one involved in Mr. Cantrell's accident. This background gives Mr. Clevenger special skill, knowledge, and experience sufficient to testify on whether the W2000 was defectively designed.

The defendants also contend that Dr. Vigilante is not qualified to offer his opinions in this

case because he has no engineering background. Dr. Vigilante holds a bachelors degree in psychology and a masters degree and PhD in ergonomics psychology. For the past nine years, he has worked as a forensic scientist in the area of human factors, safety and risk perception, product design and development, and industrial safety. (*See* Vigilante Aff. ¶ 2, May 24, 2010.) Dr. Vigilante also has performed numerous technical investigations and risk assessments on heavy construction machinery, including forklifts and excavators. (*Id.*) For this case, Dr. Vigilante examined depositions and discovery material, including specifications for the W2000, and performed a physical inspection of the machine itself. Despite these credentials, the defendants argue that Dr. Vigilante is unqualified because his degree in human factors is in psychology instead of engineering. The defendants' argument is unpersuasive.

The Fourth Circuit has upheld the admission of testimony by a human factors expert on matters that are not within the common knowledge of the jury. *See Scott v. Sears, Roebuck & Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986); *see also Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1243-44 (10th Cir. 2000) (allowing the testimony of an expert in human factors engineering and ergonomics to testify in a design defect case involving a road milling machine). Here, Dr. Vigilante is unquestionably an expert in human factors regardless of whether his background is in engineering or psychology. He also has extensive experience applying his doctorate in human factors psychology to the design of heavy machinery, including how humans foreseeably will interact with the machinery. Dr. Vigilante is, therefore, sufficiently qualified to opine on whether the placement of the shovel holder directly above the crawler tracks was a foreseeable and unreasonable danger. He also is qualified to testify on whether an alternative design would decrease the possibility of an accident like Mr. Cantrell's.

2. *Relevance of Opinions*

The defendants also argue that the opinions of Mr. Clevenger and Dr. Vigilante regarding a safe design alternative for the location of the shovel holder should be excluded because the opinions are not relevant. The defendants' argument is based on the proposition that the risk utility test does not apply in determining whether a product is defectively designed under a theory of strict liability. As further discussed below, the defendants appear to advance an overly expansive reading of *Halliday v. Sturm, Ruger & Co., Inc.*, 792 A.2d 1145 (Md. 2002); in addition, the plaintiff relies on a negligence theory to prove his case, to which the availability of a safer location for the shovel is relevant.

3. *Reliability of Methodologies*

Under Rule 702, an expert's testimony "must be supported by appropriate validation." *Daubert*, 509 U.S. at 590. The reliability of an expert's testimony is governed by various factors: (1) whether the expert's theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the methodology's known or potential rate of error; and (4) the method's or conclusion's acceptance within the relevant community. *Id.* at 593-94. The court, however, retains broad latitude in determining how to decide whether an expert's opinion is reliable. *See Kumho*, 526 U.S. at 150. A court ordinarily, of course, will not "credit an expert witness who 'testifie[s] to no customs of the trade, refer[s] to no literature in the field, and [does] not identify the reasonable expectations of customers,' but merely [gives] 'his own subjective opinion.'" *Freeman v. Case Corp.*, 118 F.3d 1011, 1016 (4th Cir. 1997) (quoting *Alevromagiros v. Hechiner*, 993 F.2d 417, 421 (4th Cir. 1993)).

The defendants attack the reliability of Mr. Clevenger and Dr. Vigilante's opinion that

placing the shovel holder elsewhere on the machine is a safer alternative. The defendants also attack the reliability of Dr. Vigilante's opinion that a warning sticker should have been affixed to the W2000 specifically warning ground crew members not to access the shovel while the machine is in reverse. Both Mr. Clevenger and Dr. Vigilante formed the basis of their opinions, in part, by performing a risk assessment evaluation of the W2000. It is important to note, as an initial matter, that the parties do not dispute whether risk assessment is a reliable methodology under *Daubert. See Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 844 (9th Cir. 2001) ("Risk assessment is an accepted methodology practiced extensively throughout the medical, scientific, and regulatory communities over the past thirty years."). The parties agree that the appropriate and scientifically accepted methodology for performing a risk assessment of a machine like the W2000 is set forth in the ISO 14121-1 (international standard), the EN 1050 (European standard), and the ANSI B11.TR3.200 (American standard).[3] The defendants dispute only whether the plaintiff's experts properly applied the risk assessment methodology in arriving at their conclusions.

The defendants argue that because Mr. Clevenger and Dr. Vigilante failed to study or observe the W2000 in the field and did not review the accident history of the machine, their opinions are unreliable.[4] First, it is unclear whether observation of the W2000 in the field or

---

[3] While these standards differ slightly, they apply the same basic principles. The parties agree that all three standards are proper ways to conduct a risk assessment test.

[4] The defendants also contend that Mr. Clevenger failed to perform a valid risk assessment test because he did not use the EN 1050 to perform his risk assessment test. Mr. Clevenger disputes this, explaining that he used an alternative method recognized as valid by the ISO, EN, and ANSI—the failure mode analysis method. (Clevenger Aff. ¶ 8; Clevenger Dep. 82:9-15; 227:17-13, July 22, 2009.) The defendants do not challenge the failure mode analysis methodology as unreliable. The defendants further suggest that because Mr. Clevenger performed portions of the risk assessment test in his head, his assessment is unreliable. Mr. Clevenger, however, wrote down his thought process in his final report, (*see* Clevenger Report, Feb. 19, 2009 at 3-6), and in his supplemental affidavit, (*see* Clevenger Aff. ¶ 8.) Thus, the defendants' objection to Mr. Clevenger's methodology will be rejected.

review of the machine's accident history is required by any of the risk assessment tests that the scientific community accepts as valid. The four components of performing a proper risk assessment under these standards are (1) determining the limits of the machinery, (2) identifying the hazards and possible accident scenarios, (3) estimating the risk of each scenario, and (4) evaluating and reducing the risk. (*See, e.g.*, ISO 14121-1, Pl.'s Ex. 13 at 4.) These factors involve predicting potential hazards based on foreseeable actions by end users and attempting to eliminate them through design. (*See, e.g.*, Clevenger Aff. ¶ 8.) None of these factors explicitly require observation of the machine in the field or reviewing the accident history of the machine. Second, even if the defendants are correct that observation of the machine in the field and review of its accident history are required to perform a successful risk assessment test, Mr. Clevenger and Dr. Vigilante in fact completed both tasks. Mr. Clevenger and Dr. Vigilante both conducted a physical inspection of the W2000 and observed it during the performance of all of the movements involved in the incident. (*See* Clevenger Dep. 46:12-16, July 22, 2009; Vigilante Aff. ¶ 5.) Both experts also reviewed the depositions of numerous employees to collect data on how employees typically operate around the road milling machine. (*See* Clevenger Aff. ¶ 6; Vigilante Aff. ¶ 5.) Likewise, both experts reviewed the deposition of Georg Piller, Wirtgen GmbH's director of safety, to determine the accident history of the W2000. (*See* Clevenger Aff. ¶ 6; Vigilante Aff. ¶ 5.)

The defendants also challenge the reliability of Mr. Clevenger and Dr. Vigilante's opinions because they did not "test" their conclusions in the field or in a controlled study. (*See* Defs.' Mot. to Exclude Opinions of Experts at 28-29.) The question, however, is whether the methodology applied by Mr. Clevenger and Dr. Vigilante has been adequately tested and

accepted within the scientific community, not whether their results have been evaluated in the field. Here, the parties agree that the risk assessment methodology is reliable and that Mr. Clevenger and Dr. Vigilante applied the methodology soundly. Thus, while the defendants may challenge Mr. Clevenger and Dr. Vigilante's conclusions drawn from the application of the risk assessment method, they must do so in court. Accordingly, the court will deny the defendants' motion to exclude the opinions of Mr. Clevenger and Dr. Vigilante.

### B.     Motion for Summary Judgment

The defendants also have moved for summary judgment on all counts. Rule 56(a) of the Federal Rules of Civil Procedure provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witnesses'

credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

### 1. *Strict Liability Claims (Count I)*

Mr. Cantrell has asserted a strict liability claim against the defendants on several grounds, including defective design, defective manufacturing, and failure to warn. In Maryland, to recover on a theory of strict liability, a plaintiff must establish that: "(1) the product was in defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition." *Phipps v. General Motors Corp.*, 363 A.2d 955, 958, 963 (Md. 1976). "A product defect can arise from the design of the product, a deficiency in its manufacture, or from the absence or inadequacy of instructions or warnings as to its safe and appropriate use." *Shreve*, 166 F. Supp. 2d at 407. Mr. Cantrell concedes that the record does not support a manufacturing defect claim. (*See* Pl.'s Opp'n to Mot. for Summ. J. at 1 n. 1.) Accordingly, the defendants' motion for summary judgment on this point will be granted.

Mr. Cantrell opposes the defendants' motion for summary judgment on his remaining claims.

### (i) *Design Defect*

As an initial matter, the parties dispute whether the "consumer expectation" test or the

"risk-utility" test for determining whether a product is defectively dangerous applies in this case. The consumer expectation test evaluates whether a product is unreasonably dangerous based on what a user of the product would properly expect the product to be suited for. *See Shreve*, 166 F. Supp. 2d at 416. The risk-utility test focuses on whether the benefits of a product outweigh the dangers of the design. *See id*. In *Halliday v. Sturm, Ruger & Co., Inc.*, 792 A.2d 1145 (Md. 2001), relied on by the defendants, the Maryland Court of Appeals held that the risk-utility test applies in design defect cases only when the product malfunctions in some way. *Halliday*, 792 A.2d at 1153.[5] *Halliday* involved a gun which functioned, as intended, to injure a human being. The Court of Appeals reiterated its holding in *Kelley v. R.G. Indus., Inc.*, 497 A.2d 1143 (Md. 1985), explaining: "The holdings in *Kelley*, that the risk-utility test does not apply to a design defect unless the product malfunctions in some way and that a handgun does not malfunction when it shoots a bullet into a person in whose direction it is fired, remain the law of Maryland." *Halliday*, 792 A.2d at 1153. When the court in *Kelley*, however, explained that the risk-utility test only applies "when something goes wrong with a product," it cited as an example a case in which a power press caught the hands of its operator. *Kelley*, 497 A.2d at 1149 (citing *Duke v. Gulf & Western Mfg. Co.,* 660 S.W.2d 404 (Mo. Ct. App. 1983)). Similarly, a road-milling machine is not intended to run over a person attempting to access the shovel, as in this case. Thus, the risk-utility test may well be applicable here. In any event, the plaintiff's experts' opinions are relevant to both tests as follows.

---

[5] In *Pinney v. Nokia, Inc.*, 402 F.3d 430 (4th Cir. 2005), cited by the plaintiff, the Fourth Circuit stated that Maryland applies the risk-utility balancing test in all strict liability claims alleging a defectively designed product. *Pinney*, 402 F.3d at 443; *see also Lloyd v. General Motors Corp.*, 266 F.R.D. 98, 108 (D. Md. 2010) ("When the product functions as intended, but the plaintiff alleges that the design is unreasonably dangerous, the risk-utility test is applicable.").

Under the consumer expectation test, a product is "unreasonably dangerous" if it is dangerous "to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." *Halliday*, 792 A.2d at 1150 (quoting Restatement (Second) of Torts § 402A, Comment i). A reasonable jury could find that the placement of the shovel holder on the back right corner of the machine, directly above the right rear crawler track, was dangerous to an extent beyond what an ordinary user would contemplate. Wirtgen GmbH specifically designed the W2000 so that "the inset of the tracks from the silhouette of the machine, the position of the tracks in regards to the rear of the machine, the position of the control panels, which would bring . . . a groundperson to the pivot point of those tracks, would keep a person out of the path of the track . . . even when they're turning." (Schmidt Dep. 108:19-25, Aug. 10, 2005.) This was done to allow a person on the ground to safely access the control panels located on the right side of the machine while it was operating. (*See id.* at 107:16-21.) In contrast to these design features, Wirtgen GmbH placed the shovel holder on the right rear side of the W2000, directly above the one spot on the machine where the crawler tracks would protrude significantly beyond the silhouette of the machine. Thus, while it was safe for a member of the ground crew to access the control panel on the right side of the machine, it was unsafe to access the shovel from the same side. In light of these design features, a reasonable juror could find that placing the shovel holder on the right rear side of the W2000 was unreasonably dangerous to the ordinary consumer.

Under the risk utility test, a court must balance "(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge

and normal public expectation of the danger . . . (6) the avoidability of injury by care in use of the product and (7) the ability to eliminate danger without seriously impairing the usefulness of the product." *Singleton v. Int'l Harvester Co.*, 685 F.2d 112, 115 (4th Cir. 1981) (quoting *Phipps*, 363 A.2d at 959, n.4). The defendants' argument that Mr. Cantrell fails to provide evidence sufficient to support a claim for defective design under the risk utility test is predicated on its motion to exclude the plaintiff's expert witness testimony. The court has already determined that the testimony of both Dr. Clevenger and Dr. Vigilante regarding the feasibility of a safer alternative design of the W2000 is admissible. Thus, an issue of fact exists regarding whether the W2000 was defectively designed under the risk utility test. Accordingly, the defendants' motion for summary judgment on the plaintiff's design defect claim will be denied.

### (ii) Failure to Warn

A manufacturer has a duty to warn of the dangers of the product "if the item produced has an inherent and hidden danger that the producer knows or should know could be a substantial factor in causing an injury." *Shreve*, 166 F. Supp. 2d at 413 (quoting *Virgil v. "Kash N' Karry" Service Corp.*, 484 A.2d 652, 657 (Md. 1984)). "Such a duty includes risks involved in the intended uses of the product as well as other reasonably foreseeable uses." *Id.* "Whether there is a duty to warn and the adequacy of warnings given must be evaluated in connection with the knowledge and expertise of those who may reasonably be expected to use or otherwise come into contact with the product." *Emory v. McDonnell Douglas Corp.*, 148 F.3d 347, 350 (4th Cir. 1998) (quoting *Mazda Motor of Amer., Inc. v. Rogowski*, 659 A.2d 391, 395 (Md. Ct. Spec. App. 1989)). A manufacturer, however, "has no duty to warn of an open and obvious danger in its product." *Id.* The defendants contend that Mr. Cantrell cannot hold them strictly liable for

failure to warn for two reasons: (1) the W2000's instruction manual contained adequate warnings regarding the danger of approaching the machine while in motion, and (2) the danger of approaching the rear crawler tracks while the machine was in reverse was open and obvious.

There is a factual dispute about whether the warnings for the W2000 were adequate. Maryland does not require manufacturers to give an "encyclopedic warning" of every mishap that could flow from a product. *See Hood v. Ryobi America Corp.*, 181 F.3d 608, 610-11 (4th Cir. 1999) (finding a manufacturer's warnings regarding a saw to be adequate as a matter of law because three labels on the saw itself and four warnings in the owner's manual directed the user not to operate the saw without the blade guards in place). Thus, the defendants would not be liable for failure to warn merely because they failed to state that it was dangerous to remove a shovel from the W2000 while it was traveling in reverse. To successfully preclude Mr. Cantrell's failure to warn claim, however, the defendants must show that the warnings they did provide were clear, specific, and unequivocal. *Id.*; *see also Lightolier, A Div. of Genlyte Thomas Grp., LLC v. Hoon*, 876 A.2d 100, 111 (Md. 2005) ("[W]arnings on products that are vague or otherwise difficult to understand shall not generally have the effect of barring a product liability claim when those warnings go unheeded.").

The defendants contend that the warnings they provided for the W2000 were sufficiently clear, specific, and unequivocal to alert Mr. Cantrell of the danger of attempting to retrieve a shovel from its holder while the machine was moving in reverse. First, the defendants highlight two warning stickers they affixed to the W2000 alerting users of the danger of sustaining severe injury from the crawler tracks. (*See* Warning Stickers Posted on W2000, Defs.' Ex. 14.) These stickers stated: "Rollover hazard/Moving crawlers will cause severe injury or death/KEEP

AWAY" and "Rollover hazard/Moving or steering crawlers will cause severe injury or death/BE

ALERT." (*Id.*) There is a factual dispute whether these stickers were sufficiently specific to

alert a user that one could be injured by the crawler tracks even when standing along the side of

the machine; a reasonable juror could find that the warning stickers were too general or vague.

Indeed, the stickers do not warn users standing or walking along the sides of the machine, an

area ostensibly clear of the crawler tracks, that they were still at risk of severe injury because the

rear crawler tracks would protrude several inches beyond the machine's frame when turned at a

sharp angle. Mr. Cantrell testified that he knew he could be injured if the crawler tracks were to

roll over part of his body, (*see* Cantrell Dep. at 110:17-20, July 18, 2008), but he did not know

the rear crawler tracks would protrude beyond the body of the W2000 when the machine turned,

(*see* Cantrell Dep. 18:15-21, Oct. 29, 2008.)

Second, the defendants emphasize two specific warnings in the W2000's instruction

manual that they believe are particularly relevant to the accident: "Danger! Stop the machine if

anyone enters the danger zone or if you approach anyone with the machine," (Wirtgen Safety

Manual, Defs.' Ex. 15 at 1-4.01-1) and "Make sure the operator sees you whenever you approach

the machine," (AEM Safety Manual, Defs.' Ex. 16 at 17). The defendants claim that if Mr.

Cantrell had followed these warnings, he would not have been injured. Similar to Wirtgen's

warning stickers, a reasonable juror also could find these warnings in the instruction manual

vague and ambiguous. *See, e.g.*, *Klein v. Sears, Roebuck and Co.*, 608 A.2d 1276, 1282 (Md. Ct.

Spec. App. 1992) (concluding that a warning for users to avoid "awkward hand positions" and to

"never reach around the saw blade" when operating a saw were "too general to be unmistakable

or undebatable."). It is debatable what area around the W2000 Wirtgen meant to include in the

17

"danger zone." It is also debatable whether the second warning emphasized by defendants, "Make sure the operator sees you whenever you approach the machine," even serves to warn a ground crew member like Mr. Cantrell of the danger of being crushed by the rear crawler tracks.

Finally, the defendants argue that the machine's back-up alarm was sufficient to warn Mr. Cantrell not to approach the machine while reversing. (*See* Defs.' Reply in Supp. of Mot. for Summ. J. at 22.) The defendants are correct that Mr. Cantrell knew that the "blaring back-up alarm" warned him to take precautions. (*See* Cantrell Dep. 88:18-89:7, July 18, 2008.) The record demonstrates, however, that Mr. Cantrell did take precautions upon hearing the alarm. He was careful not to walk directly behind the machine and placed his feet sideways so as to avoid the tracks as the machine moved in reverse. Thus, the defendants cannot rely on the back-up alarm alone to defeat the plaintiff's failure to warn claim.

In the alternative, the defendants argue that the danger of approaching "a piece of mobile equipment that is traveling in reverse on crawler tracks that can laterally rotate at any time is 'open and obvious.'" (Defs.' Mot. for Summ. J. at 35.) When the design of the W2000 is taken into consideration, the court cannot conclude that this danger is open and obvious as a matter of law. Because Wirtgen specifically designed the W2000 to allow ground crew members to safely approach the machine while mobile by fitting the crawler tracks within the silhouette of the machine, the danger of being injured by the tracks was not necessarily open and obvious. It was also not necessarily open and obvious that the crawler tracks would protrude from the body of the machine. Moreover, while Mr. Cantrell knew the crawler tracks were dangerous, (*see* Cantrell Dep. at 110:17-20, July 18, 2008), he did not know the rear crawler tracks would protrude beyond the body of the W2000 when the machine turned, (*see* Cantrell Dep. 18:15-21,

Oct. 29, 2008).

The defendants also contend that the general prohibition against approaching a moving vehicle in the construction industry rendered approaching the W2000 while mobile an open and obvious danger. It is a disputed question whether this prohibition applied to the W2000, a machine that traveled at approximately three miles per hour. Mr. Cantrell testified that he had walked behind the W2000 numerous times while the machine was moving and had observed other ground crew workers do the same on numerous occasions. (*See* Cantrell Dep. 239:14-240:9, July 18, 2008.) Even if the prohibition does apply to the W2000, however, the construction industry prohibition against approaching a moving vehicle alone does not render the specific danger in this case open and obvious. If the prohibition were applied so broadly, then all individuals injured by moving construction equipment would be barred from recovery. Accordingly, the defendants' motion for summary judgment on the plaintiff's failure to warn claim will be denied.

## 2. *Negligence Claims (Count II)*

The defendants also have moved for summary judgment on the plaintiff's negligence claim on two grounds. First, the defendants contend that Wirtgen America is not liable on the plaintiff's negligence claim because it had nothing to do with the design of the W2000. "Where recovery for injuries resulting from a defective product is premised upon negligence, a manufacturer or a dealer is liable only if he knew of or could have by reasonable care discovered the defect." *Frericks v. General Motors Corp.*, 336 A.2d 118, 128 (Md. 1975). A manufacturer can be presumed to have known about a design defect, but a "dealer who had nothing to do with the design of the [product] cannot be presumed to know of the defective design." *Id.* (observing

that in the case of design negligence, it is particularly difficult to find a logical basis for imposing liability on a retailer because design generally "involves questions of specialized knowledge which the retailer cannot be expected to have."). There is a factual issue, however, regarding whether Wirtgen America took part in the design process of the W2000.

Both Jan Schmidt, a management employee at Wirtgen America, and Georg Pillar, Wirtgen GmbH's director of safety, provided deposition statements suggesting that Wirtgen America's role was not limited strictly to distributing the W2000. Mr. Schmidt stated that when Wirtgen GmbH announced its decision to update the design of the road milling machine to allow the rear crawler tracks to turn and thus protrude from the silhouette of the machine, he expressed concern over whether this would increase the danger that someone could have their foot run over. He admitted that he inquired with Wirtgen GmbH representatives about what kind of safety considerations the German company was taking to ensure that the risk factors were taken into account during the design process. (*See* Schmidt Dep. 108:12-109:12, Aug. 10, 2005.) When asked whether Wirtgen America and Wirtgen GmbH communicated during the design process of the W2000 specifically, Mr. Piller responded that "there is permanently a base of communication" and that on a "day-to-day basis" subsidiaries like Wirtgen America provide input, even at the concept phase. (*See* Piller Dep. 35:4-24, Oct. 9, 2008.) Based on this testimony, there is a genuine question of fact regarding whether Wirtgen America played a role in the design process of the W2000 and therefore could be liable under the plaintiff's negligence claim. Accordingly, the defendants' motion for summary judgment with respect to the plaintiff's negligence claim against Wirtgen America will be denied.

The defendants also contend that they are not subject to liability for either negligence or

breach of warranty because Mr. Cantrell's own negligence contributed to the accident. In Maryland, "a plaintiff's own conduct may constitute a bar to recovery if that plaintiff is determined . . . to also be guilty of negligence which was a direct contributing cause of the injury." *Moran v. Faberge, Inc.*, 332 A.2d 11, 21 (Md. 1975). Likewise, in a breach of warranty claim, a plaintiff who uses a product with knowledge of its defect contributes to any ensuing injury from use of the product and is barred from recovery. *See Erdman v. Johnson Bros. Radio & Television Co., Inc.*, 271 A.2d 744, 747 (Md. 1970). To establish contributory negligence as a matter of law, "the evidence must show some prominent and decisive act which directly contributed to the accident and which was of such a character as to leave no room for difference of opinion thereon by reasonable minds." *Baltimore Gas & Elec. Co. v. Flippo*, 705 A.2d 1144, 1155 (Md. 1998) (quoting *Reiser v. Abramson*, 286 A.2d 91, 93 (Md. 1972)). "Where there is a conflict of evidence as to material facts relied on to establish contributory negligence, or more than one inference may be reasonably drawn therefrom," the issue of contributory negligence is for the jury. *Id.* The plaintiff has provided sufficient evidence to raise an issue of fact regarding whether Mr. Cantrell acted as a person of ordinary prudence when he approached the W2000 to retrieve the shovel.

As discussed above, it is an open question whether the construction industry prohibition against approaching moving equipment applied to the W2000 road milling machine, because it traveled at speeds less than three miles per hour. (*See* Cantrell Dep. 239:14-240:9, July 18, 2008). Even if the prohibition did apply, it would not conclusively prove that Mr. Cantrell acted negligently when he approached the W2000 to reach a shovel located at the rear of the machine. The defendants have failed to provide sufficient evidence for the court to find as a matter of law

that Mr. Cantrell's actions amounted to contributory negligence. Accordingly, the defendants'

motion for summary judgment on the negligence and breach of warranty claims will be denied.

## CONCLUSION

For the foregoing reasons, the defendants' motion to exclude the plaintiff's expert

witness opinions will be denied. The defendants' motion for summary judgment will be granted

in part and denied in part. A separate Order follows.


March 15, 2011                                           /s/
Date                                      Catherine C. Blake
                                          United States District Judge